IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

UNITED STATES OF AMERICA,       )
                                )
            Plaintiff,          )
                                )
      v.                        )       Criminal Action No. 11-117-GMS
                                )
HILDAGO NAINSKY CABRERA and     )
JUAN CARLOS RODRIGUEZ           )
                                )
            Defendants.         )
_____)

## MEMORANDUM

### I.    INTRODUCTION

On December 15, 2011, the Grand Jury for the District of Delaware indicted Hildago

Nainsky Cabrera, ("Mr. Cabrera"), and Juan Carlos Rodriguez, ("Mr. Rodriguez"), (collectively

"the Defendants"), for one count of conspiracy to possess a controlled substance with intent to

distribute and one count of possession of a controlled substance with intent to distribute. (D.I. 9;

D.I. 10.)  Presently before the court is the Defendants' Motion to Suppress Physical Evidence

("Motion to Suppress").[1] (D.I. 28; D.I. 31.)  On June 20, 2012, the court held an evidentiary

hearing in connection with this motion. (D.I. 33.)  Afterwards, the Defendants filed memoranda

---

[1]      Mr. Cabrera filed the Motion to Suppress Physical Evidence, (D.I. 28), and Mr. Rodriguez submitted a
Motion to Join and Adopt Mr. Cabrera's Motion to Suppress Physical Evidence, (D.I. 31). In his Memorandum of
Law in Support of the Motion to Suppress, (D.I. 36), Mr. Rodriguez also expressed that he was adopting Mr.
Cabrera's statement of facts and legal arguments. In a letter dated October 10, 2013, (D.I. 47), Mr. Rodriguez
further moved to join and adopt the positions that Mr. Cabrera advanced in Mr. Cabrera's Supplemental
Memorandum. Accordingly, the court will grant Mr. Rodriguez's requests and treat the facts recited and the
arguments advanced in Mr. Cabrera's Motion to Suppress, his Opening Memorandum, (D.I. 35), Reply
Memorandum, (D.I. 38), and his Supplemental Memorandum, (D.I. 46), as having been made on behalf of both
Defendants.

In order to permit full consideration of the issues raised by the Defendants' Motion to Suppress, the United States'
response, the evidentiary hearings, and the parties' supplemental briefing, the court within its discretion concluded
that the ends of justice are best served by deciding the Motion to Suppress and that those ends outweigh the interests
of the public and the defendant in a speedy trial.

in support of their Motion to Suppress, (D.I. 35; D.I. 36; D.I. 38), and the government filed a memorandum in opposition, (D.I. 37). On November 8, 2012, after considering the parties' memoranda and the testimony and evidence introduced at the June 20th hearing, the court ordered a supplemental evidentiary hearing to clarify the record.[2] (D.I. 39.) The supplemental evidentiary hearing occurred on July 25, 2013, (D.I. 49), after which the Defendants filed supplemental memoranda in support of the Motion to Suppress, (D.I. 46; D.I. 47). For the reasons that follow, the court will deny the Defendants' Motion to Suppress.

## II.   FINDINGS OF FACT

At the first evidentiary hearing on June 20, 2012, the United States ("the government") called four witnesses: Special Agent Emory J. Hall ("Special Agent Hall") of the New Jersey Division of the Drug Enforcement Administration ("DEA"), Detective Ronald Marzec of the Delaware Police Department ("Detective Marzec"), Corporal Lawrence Seitz of the Delaware State Police ("Corporal Seitz"), and Officer Robert J. Wall of the Delaware State Police ("Officer Wall"). (D.I. 33 *passim*.) At the supplemental evidentiary hearing on July 25, 2013, the government called Special Agent Hall and Corporal Seitz again. (D.I. 49 *passim*.) The

---

[2]   In its Notice of Supplemental Hearing on Motion dated November 8, 2012, the court explained that "[i]t is the court's hope that this supplemental hearing will clarify the record with respect to the following factual issues: (1) the case law and/or relevant information on which the Drug Enforcement Agency [*sic*], New Jersey Division and/or any other division, relied in concluding that a GPS device could be installed without law enforcement first obtaining a search warrant; (2) the case law and/or relevant information on which the U.S. Attorney's Office for the District of New Jersey relied in concluding that a GPS device could be installed without law enforcement first obtaining a warrant; (3) whether obtaining a warrant prior to GPS installation would have impeded the investigation or been impracticable; and (4) how the window tint on the Dodge Ram pick-up truck violated 21 Del. C. Section 4313(a) according to Delaware State Police Corporal Lawrence Seitz." (D.I. 39.)

On July 12, 2013, the court issued an Order and Notice of Final Supplemental Hearing on Motion in which it explained that the supplemental hearing would supplement the record regarding: "(1) whether Special Agent Hall received approval(s) on the DEA GPS tracking form that he submitted to superiors in the DEA New Jersey Division and from whom/which entity he received approval; and (2) how the window tint on the Dodge Ram pick-up truck violated Delaware law according to Corporal Lawrence Seitz." (D.I. 44.)

Defendants did not call any witnesses at either hearing. After listening to the testimony of the witnesses, the court concludes that the account provided by Special Agent Hall, Detective Marzec, Corporal Seitz, and Officer Wall is credible. The following represents the court's findings of fact as required by Rule 12(d) of the Federal Rules of Criminal Procedure.

The events that culminated in the arrest and indictment of the Defendants arose out of two simultaneous investigations. One investigation commenced in early May 2011 and was conducted by Special Agent Hall into Mr. Rodriguez's narcotics trafficking operation. (D.I. 33 at 5.) Special Agent Hall first obtained information about Mr. Rodriguez from an individual who he arrested in May 2011 and who became his confidential source ("CS"). (*Id.* at 5.) Special Agent Hall believed the CS to be an established narcotics trafficker because of the large quantities of cocaine found in the CS's vehicle and residence. (*Id.*) The CS informed him that Mr. Rodriguez was a narcotics trafficker and that he had been purchasing cocaine from Mr. Rodriguez for three years. (*Id.* at 6.) The CS was also able to provide information such as the sources and price per kilogram of Mr. Rodriguez's cocaine, the means through which Mr. Rodriguez distributed the cocaine, and the phone numbers and vehicles that Mr. Rodriguez used. (*Id.* at 6-7.) The CS further disclosed to Special Agent Hall that Mr. Rodriguez used a Dodge Ram pick-up truck ("Dodge Ram") to facilitate his narcotics trafficking. (*Id.* at 9.) The CS identified the Dodge Ram's license plate number and expressed that he suspected that the Dodge Ram had a hidden compartment. (*Id.*)

The second investigation from which these matters arise commenced in late 2010 to early 2011 when Detective Marzec began to examine the Delaware-based drug trafficking organization of which Mr. Cabrera was a member. (*Id.* at 39-40.) Detective Marzec identified

3

apartments 1407 and 4807 of the Christiana Meadows apartment complex as being associated with Mr. Cabrera's organization.[3]  (*Id.* at 40.)

## A. Installation of the GPS Tracker on September 15, 2011

On or about September 1, 2011, the New York Police Department conducted a motor vehicle stop of the Dodge Ram at Special Agent Hall's behest as Mr. Rodriguez was driving it.[4] (D.I. 33 at 10.)  On or about September 7, 2011, Special Agent Hall's partner[5] showed the CS a photo of Mr. Rodriguez and the CS was able to identify Mr. Rodriguez.  (*Id.*)  On September 14, 2011, Special Agent Hall completed a form seeking authorization for use of a GPS tracker on the Dodge Ram.  (*Id.* at 10-11; Gov't Ex. 1 (completed New Jersey Division Vehicle Tracker Installation Tech Request form dated September 14, 2011).)  His group supervisor, the Assistant Special Agent in Charge, and an Assistant United States Attorney in the District of New Jersey named Brian Urbano, ("AUSA Urbano"), all authorized the installation and subsequent use of the tracker.  (*Id.* at 12, 34; Gov't Ex. 1 (showing the signatures and notes regarding a conversation with AUSA Urbano.)  Special Agent Hall did not apply for or obtain a search warrant authorizing the placement of the tracker on the Dodge Ram, however.[6]  (*Id.* at 15.)  On or about September 15, 2011, Special Agent Hall and Special Agent Barucci provided cover for

---

[3]     Detective Marzec was not questioned about how precisely he learned about the apartments.

[4]     The truck was registered to a resident of Maryland named Jorge Leonardo Martinez.  (D.I. 33 at 13; Gov't Ex. 1.)

[5]     Special Agent Hall did not provide the name of his partner during his testimony at the evidentiary hearing.

[6]     Special Agent Hall also testified that he did not secure the consent of Mr. Martinez, the registered owner of the Dodge Ram, before the GPS tracker was installed.  (D.I. 33 at 32.)

4

ITS specialist Bruce Stafford to install the tracker on the Dodge Ram while the vehicle was parked on a public street in New York. (*Id.* at 13.)

The GPS tracker was a small, rectangular object attached by cable to an external battery and placed underneath the rear section of the Dodge Ram. (*Id.* at 13-14.) It transmitted longitudinal and latitudinal information to a laptop and DEA agents then converted that information to addresses, streets, and map functions. (*Id.* at 15.) Agents were able to obtain the location of the Dodge Ram at any point in time while the tracker was on the vehicle.[7] (*Id.* at 16.) In addition, the tracker contained a geofence feature, through which the DEA would be alerted whenever the Dodge Ram left the State of New York, was on the Verrazano Bridge, or was in the vicinity of a suspected drug stash house. (*Id.* at 16, 35.) The tracker remained on the Dodge Ram until both Mr. Rodriguez and Mr. Cabrera were arrested on November 21, 2011. (*Id.* at 14.) Over the course of tracking the Dodge Ram with the GPS tracker, Special Agent Hall noticed that the vehicle would frequently travel to Delaware from New York, remain in Delaware for less than an hour, and then return to New York. (*Id.* at 17.) This was consistent with the CS's claim that Mr. Rodriguez frequently traveled out of state to conduct narcotic transactions. (*Id.*)

In October 2011, Special Agent Hall contacted Detective Marzec and informed him that Mr. Rodriguez's modus operandi was to travel to Delaware and obtain cocaine there to sell in New York. (*Id.* at 40.) From then on, Special Agent Hall and Detective Marzec collaborated in

---

[7]     On November 20, 2011, the DEA's technology department changed the tracker's battery while the Dodge Ram was on a public street in Brooklyn, New York. After this, the tracker was reattached under the Dodge Ram. (D.I. 33 at 32.) Special Agent Hall received permission from his group supervisor to have the battery changed. (*Id.* at 33.)

investigating Mr. Rodriguez's drug trafficking. (*Id.*) Special Agent Hall focused on Mr. Rodriguez's movements in New York while Detective Marzec focused on Mr. Cabrera in Delaware. (*Id.*) Although Special Agent Hall informed Detective Marzec that there was a GPS tracker on Mr. Rodriguez's Dodge Ram, neither Detective Marzec nor any other agent from Delaware had direct access to the data generated by the tracker. (*Id.* at 41.) Detective Marzec relied on reports from Special Agent Hall. (*Id.*)

### B. Currency Seizure on November 4, 2011

On November 2, 2011, Special Agent Hall and his partner drove with the CS to what they suspected was a drug stash house of Mr. Rodriguez's. (D.I. 33 at 41.) The CS visually identified the drug stash house in front of which the Dodge Ram was parked at that time. (*Id.* at 16-17; Gov't Exs. 2-4 (depicting the Dodge Ram in front of the drug stash house).) On November 4, 2011, Special Agent Hall received a phone call from the DEA informing him that the tracker had crossed the geofence corresponding to the Verrazano Bridge. (*Id.* at 19, 35.) He notified Detective Marzec that the vehicle was southbound and possibly traveling to Delaware.[8] (*Id.* at 19, 35, 42.) Upon receiving notification from Special Agent Hall, Detective Marzec alerted other agents and, along with them, established surveillance on the I-95 highway just inside Delaware. (*Id.* at 42.) Simultaneously, Special Agent Hall and his partner traveled to the New Jersey Turnpike in the hopes of catching up to the Dodge Ram.[9] (*Id.* at 20.) At this point, none

---

[8]     Detective Marzec acknowledged that, if not for the call from Special Agent Hall, neither he nor anyone in his office would have known that the Dodge Ram was traveling into Delaware on November 4, 2011. (D.I. 33 at 69.)

[9]     Special Agent Hall and his partner set out from New York in separate cars initially. (D.I. 33 at 20.) After following the Dodge Ram for a distance, Special Agent Hall and his partner parked at the Walt Whitman Rest Area. (*Id.*) At this point, both Special Agent Hall and his partner entered the same car and continued mobile surveillance

of the agents were certain of who was driving the Dodge Ram. (*Id.*) Special Agent Hall and his partner followed the Dodge Ram across the Delaware Memorial Bridge to a La-Z-Boy Furniture Store's parking lot in Newark, Delaware. (*Id.*) As Special Agent Hall and his partner were trailing the Dodge Ram into the parking lot, Detective Marzec and the other Delaware agents were also observing the Dodge Ram's movements. (*Id.*)

At the parking lot, another member of the task force, Special Agent Miller, observed Mr. Rodriguez exit the Dodge Ram while on his cell phone, glance at a Toyota Corolla, and then reenter the Dodge Ram. (*Id.* at 22, 44.) The Toyota Corolla proceeded to park next to the Dodge Ram and Mr. Cabrera exited the Corolla empty handed to enter the front passenger side of the Dodge Ram. (*Id.*) After a few minutes, Mr. Cabrera exited the Dodge Ram carrying a plastic bag that appeared weighted, reentered the Corolla, and both vehicles departed. (*Id.* at 22-23, 44.) At this point, the agents still did not know who was in the Dodge Ram because its windows were tinted. (*Id.* at 45.)

During the surveillance, the task force members had arranged for Corporal Harris of the Delaware State Police to conduct a traffic stop of the Toyota Corolla. (*Id.* at 46.) As soon as the Corolla departed the parking lot, Corporal Harris stopped the Corolla for failure to signal a lane change. (*Id.*) Upon stopping the vehicle, Corporal Harris identified the driver as Mr. Cabrera and noticed that he seemed "extremely nervous at the time." (*Id.*) She also noticed a grocery bag on the passenger seat next to him. (*Id.*) When she asked Mr. Cabrera what was inside the bag, he advised her that it contained $20,000 or $30,000. (*Id.*) At that point, she asked him to

---

of the Dodge Ram. (*Id.*) From the Walt Whitman Rest Area to the La-Z-Boy parking lot, Special Agent Hall and his partner maintained constant visual surveillance of the Dodge Ram. (*Id.* at 21-22.)

step away from the vehicle and requested and received his consent to search the Corolla. (*Id.* at 47.) There were no other occupants in the vehicle. (*Id.*) Corporal Harris seized the money and Mr. Cabrera voluntarily followed her to Troop 2, the Delaware State Police office, in order to receive a receipt for the amount of money seized. (*Id.* at 47-48.)

At Troop 2, a K-9 scan of the money was conducted and the dog detected the odor of controlled substances around the money. (*Id.* at 47.) Corporal Harris observed Mr. Cabrera in the lobby of the building and noticed that he seemed distraught as he spoke on a cell phone in Spanish. (*Id.* at 48.) This was the extent of the investigative activity on November 4, 2011. (*Id.*) Shortly after, Special Agent Hall's CS informed him that Mr. Rodriguez complained to the CS of having lost approximately $100,000. (*Id.* at 23.)

### C. Arrest of the Defendants on November 21, 2011

On November 21, 2011, Special Agent Hall again received a phone call from the DEA informing him that the tracker had crossed the geofence in the vicinity of the Verrazano Bridge. (D.I. 33 at 24.) Upon receiving that information, he contacted Detective Marzec and informed him that the Dodge Ram was southbound on the I-95 and likely headed to Delaware.[10] (*Id.* at 24, 48, 50.) As they had done on November 4, 2011, Special Agent Hall and his partner pursued the Dodge Ram in their own vehicle, eventually reaching the Dodge Ram on the New Jersey side of the Delaware Memorial Bridge. (*Id.* at 24.) There, they initiated visual surveillance. (*Id.*) Simultaneously, Detective Marzec informed the other Delaware members of the task force that Mr. Rodriguez was traveling southbound. (*Id.* at 48.) As they had on November 4, 2011,

---

[10]     Detective Marzec acknowledges that, if not for the call from Special Agent Hall, neither he nor anyone from his office would have known that the Dodge Ram was traveling into Delaware on November 21, 2011. (D.I. 33 at 70.)

Detective Marzec and the other Delaware agents again established surveillance along the I-95. (*Id.*)

As the Dodge Ram entered Delaware via the Delaware Memorial Bridge, Detective Marzec and the Delaware agents maintained visual surveillance of it. (*Id.*) Due to the vehicle's tinted windows, neither the Delaware task force nor Special Agent Hall and his partner could discern who was driving the Dodge Ram. (*Id.* at 24-25, 49-50.) The vehicle proceeded to Christiana Mall, where both Special Agent Hall and Detective Marzec observed as it parked in a Macy's parking lot. (*Id.* at 25, 48-49.) They watched as Mr. Rodriguez exited the vehicle to walk to the Macy's. (*Id.*) While Mr. Rodriguez was gone, Detective Marzec approached the Dodge Ram and confirmed by peering into the vehicle's windshield that there were no other occupants inside it. (*Id.* at 50.)

Shortly after, Mr. Rodriguez emerged from the Macy's accompanied by Mr. Cabrera. (*Id.* at 25, 51.) Mr. Rodriguez entered the Dodge Ram's driver's seat, with Mr. Cabrera in the front passenger's seat, and they departed the parking lot. (*Id.* at 25.) All of the agents followed the Dodge Ram, maintaining visual surveillance, as Mr. Rodriguez drove to the Christiana Meadows apartment complex. (*Id.*) Both Special Agent Hall and Detective Marzec observed Mr. Rodriguez enter the apartments, after which Special Agent Hall and his partner ceased surveillance to purchase some gas. (*Id.* at 25-26.) Detective Marzec did not follow the vehicle into the apartment complex, but advised other members of the Delaware Task Force, Special Agent Heisman and Officer Stout, to check the 1400 and 4800 buildings of the apartment complex for the Dodge Ram. (*Id.* at 52.) He advised the agents to check these areas based on his prior knowledge that these two locations were associated with Mr. Cabrera. (*Id.* at 52.)

9

Special Agent Heisman and Officer Stout found the Dodge Ram in front of the 4800 building and observed it parked there for approximately 20 minutes. (*Id.*) The Defendants then emerged from the building, with Mr. Rodriguez carrying a duffel bag that seemed heavy. (*Id.* at 53.) Mr. Rodriguez entered the driver's seat of the Dodge Ram while Mr. Cabrera entered the front passenger's seat. (*Id.*) After remaining stationary for several minutes, the Defendants left the apartment complex and Detective Marzec resumed visual surveillance. (*Id.* at 54.) Having purchased gas and food, Special Agent Hall and his partner also reestablished visual surveillance in time to observe the Dodge Ram exiting the apartment complex. (*Id.* at 26.) The Defendants traveled back to Christiana Mall with the agents in tow. (*Id.* at 26, 54-55.)

### 1. Search of the Dodge Ram

During the surveillance, the Delaware task force asked the Delaware State Police to conduct a traffic stop of the vehicle. (D.I. 33 at 55, 84.) Consequently, as the Dodge Ram reentered Christiana Mall, Corporal Seitz of the Delaware State Police initiated the traffic stop. (*Id.*) At the time, Corporal Seitz was in contact with Officer Stout and was aware that the task force was conducting surveillance of suspected narcotics traffickers. (*Id.* at 72, 77, 84.) Officer Stout informed him that the Dodge Ram was the target vehicle and asked Corporal Seitz to develop probable cause to stop the vehicle.[11] (*Id.* at 78, 85; D.I. 49 at 8-9.) Subsequently, he stopped the Dodge Ram because its windows were tinted in what he believed was a violation of the Delaware Motor Vehicle Code.[12] (D.I. 33 at 78, 85; D.I. 49 at 5; Gov't Ex. 12 (Section 4313

---

[11]     Corporal Seitz acknowledged that, had he not spoken to Mr. Stout, he would not have known to find and stop the Dodge Ram. (D.I. 33 at 85.) He also testified that the traffic stop was entirely a pretext to stop the Dodge Ram for the purpose of conducting a narcotics investigation. (*Id.* at 92.)

[12]     Section 4313(a) provides: "No person shall operate any motor vehicle on any public highway, road or street with the front windshield, the side windows to the immediate right and left of the driver and/or side wings

of the Delaware Motor Vehicle Code prohibiting window tinting with certain exceptions).) After explaining to the Defendants why he stopped the vehicle, he obtained their consent to search the Dodge Ram. (D.I. 33 at 80-81.) Corporal Seitz then proceeded to search the Dodge Ram with Officer Wall and some other officers on the scene. (*Id.* at 82, 90; Gov't Ex. 11 (Corporal Seitz's report dated November 21, 2011).[13]) Officer Wall was in charge of the K-9 search of the vehicle and, like Corporal Seitz, he was aware from discussing with Officer Stout that the DEA was conducting a narcotics traffic investigation. (D.I. 33 at 82, 90.) With the dog on a leash, Officer Wall allowed the dog to sniff the exterior of the vehicle and permitted the dog to insert his head into the then-open car door on the driver's side of the vehicle in order to sniff beneath the driver's seat. (*Id.* at 99-100.) The dog then sat down by the driver's seat, indicating that the odor of narcotics was present. (*Id.* at 100.)

Detective Marzec observed the Delaware State police conduct a K-9 scan of the vehicle and was advised that the dog detected the odor of narcotics. (*Id.* at 56-57.) After about 20 minutes, he was informed that the troopers had also located a bag consistent with what Mr. Rodriguez had been observed carrying out of the Christiana Meadows apartment complex. (*Id.*) The bag was empty, however, and the troopers were unable to locate its contents. (*Id.*) At this point, Detective Marzec exited his vehicle, approached the Dodge Ram, and crawled underneath the vehicle to examine the underside of the vehicle. (*Id.*) He saw that the underside had been sprayed with what appeared to be a sealant and also noticed that, above the drive shaft, an

---

forward of and to the left and right of the driver that do not meet the requirements of Federal Motor Vehicle Safety Standard 205 in effect at the time of its manufacture." Corporal Seitz testified that he believed that the vehicle was violating Delaware law by having tinted windows, but he was not familiar with the precise contours of Federal Safety Standard 205. (D.I. 49 at 10-12.)

[13]     Corporal Seitz reported that it was his practice to memorialize events on the same day that they occurred.

aftermarket heat shield made of what appeared to be fiberglass had been placed there. (*Id.*) Upon manually removing the fiberglass, Detective Marzec observed an aftermarket compartment. (*Id.*) He rose to his feet and searched the car until he saw that there were several screws missing from the center console and that a glue-like substance "not consistent with the manufacture of a vehicle" was present in the console. (*Id.* at 57-58.) He also observed a hinged area at the front of the center console. (*Id.* at 58.)

Upon observing these features of the center console, Detective Marzec pried the glue away from the console, probed beneath the console with a screwdriver, and was able to dislodge a locking device. (*Id.* at 58, 75.) The center console lifted and Detective Marzec viewed several kilograms of what appeared to be cocaine inside. (*Id.*) The Defendants were promptly arrested and patted down, in the process of which the agents located a set of keys on Mr. Cabrera's person. (*Id.* at 59.) The Defendants were then transported to the Wilmington DEA office where they were advised of their *Miranda* rights. (*Id.* at 26, 56, 59.) The Dodge Ram was also seized. (*Id.* at 66.) Within the Dodge Ram, Detective Marzec found a temporary auto identification card that belonged to Alvarez Alicio Rodriguez. (*Id.* at 66-67.)

### 2. Search of 1407 Christiana Meadows

After being advised of his *Miranda* rights at the Wilmington DEA office, Mr. Cabrera orally consented to a search of 1407 Christiana Meadows and signed a consent form authorizing such.[14] (D.I. 33 at 27-29, 59-60.) Special Agent Dunn led a group of agents to conduct a search of the premises. (*Id.* at 60.) At the residence, the agents encountered a woman named Anna Lee

---

[14]     Prior to the evidentiary hearing, Detective Marzec was unable to locate the consent form that Mr. Cabrera signed. (D.I. 33 at 60.)

Duran-Medina, who identified herself as Mr. Cabrera's girlfriend and a resident at 1407 Christiana Meadows. (*Id.* at 60-61.) Ms. Medina consented to a search of the premises. (*Id.* at 61.) Officer Wall, who conducted the K-9 scan of the Dodge Ram earlier, also conducted a K-9 search of the premises at apartment 1407. (*Id.* at 101.) During the search, agents found $10,000, a shoebox filled with rubber bands, and finger moisturizer all in a rear bedroom. (*Id.*)

### 3. Search of 4807 Christiana Meadows

Detective Marzec gave Special Agent Dunn the set of keys that had been found on Mr. Cabrera's person earlier in the day and instructed him to determine if any of the keys fit the door at 4807 Christiana Meadows. (*Id.* at 62.) During questioning, Mr. Cabrera had denied any association with apartment 4807, stating that he resided at apartment 1407. (*Id.* at 68.) Consistent with Mr. Cabrera's denial, agents found that the residence was not owned, leased, or occupied by Mr. Cabrera. (*Id.* at 67.) After searching apartment 1407, Special Agent Dunn proceeded to apartment 4807 and found that one of the keys unlocked the door there too. (*Id.* at 62.) Special Agent Dunn did not go into the apartment, however, and instead had Officer Wall conduct a K-9 scan of each of the doors located on the same level as apartment 4807. (*Id.* at 62-63, 102.) Upon reaching the door of apartment 4807, the dog detected the odor of narcotics at the door. (*Id.* at 63, 102-03.) Based on this information, Detective Marzec obtained a search warrant from a judge. (*Id.* at 64; Gov't Ex. 8 (search warrant application and affidavit).) Special Agent Dunn then conducted the search of apartment 4807 and Officer Wall also conducted a K-9 scan of the apartment's interior. (*Id.* at 65, 104.)

The apartment was sparsely furnished, with little food inside the residence, and it did not appear that anyone lived there. (*Id.* at 68.) During the search, a duffel bag containing

13

approximately 18 kilograms of cocaine was located in the rear bedroom and another duffel bag containing one kilogram of cocaine was located in the laundry room area. (*Id.* at 65.) A money counter was also located in the kitchen area. (*Id.*; Gov't Exs. 5-7 (depicting the cocaine and the money counter).) Neither Detective Marzec nor Special Agent Hall assisted with the search, but both were on the premises when the bags of cocaine were located. (*Id.* at 30, 65.)

## III.   CONCLUSIONS OF LAW

### A. Mr. Cabrera's Standing

As an in initial matter, the parties differ regarding whether Mr. Cabrera has standing to challenge the following: (1) the installation and use of the GPS tracker to monitor the Dodge Ram's movements over the course of the investigation; (2) the traffic stop of the Dodge Ram on November 21, 2011, the search of the vehicle conducted after the stop, and the narcotics thereby discovered; and (3) the search of the apartment at 4807 Christiana Meadows and the narcotics discovered in the apartment during that search. For the following reasons, the court concludes that Mr. Cabrera lacks standing to challenge all of these matters.

### 1. Standing to Challenge the Installation and Use of the GPS Tracker

Mr. Cabrera argues that the government conducted a search for the purposes of the Fourth Amendment when it installed and used the GPS tracker to monitor the Dodge Ram's movements. (D.I. 35 at 4-6.) Consequently, he contends, because this search was warrantless, the court must suppress as fruits of the poisonous tree all evidence seized from the Dodge Ram, Mr. Cabrera's person, and the two apartments at Christiana Meadows. (*Id.* at 6.) In response, the government argues that, as a mere passenger, Mr. Cabrera does not have standing to

challenge the installation and use of the GPS tracker.[15] The court concludes that the government is correct.

In the Fourth Amendment context, standing is "shorthand for the determination of whether the litigant's Fourth Amendment rights have been implicated." *United States v. Mosley*, 454 F.3d 249, 253, n.5 (3d Cir. 2006). For nearly half a century, the reasonable expectation of privacy test articulated in Justice Harlan's concurrence in *Katz v. United States*, 389 U.S. 347, 360-62 (1967), has been the dominant method for evaluating when the Fourth Amendment is violated. Under the *Katz* test, a party has standing to challenge a search if he can establish that he had a legitimate expectation of privacy in invaded place. *Katz*, 389 U.S. at 360-62; *see also United States v. Cortez-Dutrieville*, 743 F.3d 881, 883 (3d Cir. 2014).

In *United States v. Jones*, the Supreme Court indicated that defendants' Fourth Amendment rights "do not rise or fall with the *Katz* formulation." 132 S. Ct. 945, 951 (2012) (Explaining that "for most of our history the Fourth Amendment was understood to embody a particular concern for government trespass upon the areas ('persons, houses, papers, and effects') it enumerates. *Katz* did not repudiate that understanding.") Instead of relying on the *Katz* test, the *Jones* majority examined whether the police had engaged in trespassory activity on a category of property protected by the Fourth Amendment. *Id.* at 951, n.3. Thus, the court concluded that an unconsented-to installation of a GPS tracker on a vehicle is a search for the purposes of the Fourth Amendment because "here, the Government obtains information by physically intruding on a constitutionally protected area[.]" *Id.*

---

[15]    Because Mr. Rodriguez was the operator of the Dodge Ram, the government does not contest Mr. Rodriguez's standing to challenge the installation and use of the GPS tracker to monitor the vehicle's movements. (D.I. 37 at 13-14.)

15

Unlike *Katz*'s focus on the defendant's reasonable expectations, the defendant's rights in the invaded property were central to the *Jones* majority's ruling. As the *Jones* majority made clear, however, while *Katz* is not the exclusive test, "we do not make trespass the exclusive test." *Id.* at 922. Consequently, in the aftermath of *Jones*, the court analyzes Fourth Amendment matters under both the *Jones* property rights approach and the *Katz* reasonable expectation of privacy test.[16]

Applying the *Jones* approach to the instant case, Mr. Cabrera lacks standing to challenge the monitoring of the Dodge Ram with the GPS tracker because cannot establish that he had any property rights in the Dodge Ram that were intruded upon when the GPS tracker was installed and used. Mr. Cabrera was not the owner of the vehicle and there is no evidence that he even so much as drove the vehicle at any point in the months-long investigation. Indeed, Mr. Cabrera has not pointed to any case law supporting the assertion that a passenger in these circumstances somehow has any property rights in a vehicle that exist even before the passenger enters the vehicle. In short, there is no basis to find that Mr. Cabrera has standing under a *Jones* inquiry to challenge the installation and use of the GPS tracker to monitor the Dodge Ram. Likewise, there is no basis to find that Mr. Cabrera has standing under the traditional *Katz* test. As the Third Circuit has noted, "passengers in cars, unlike owners or licensees, have no reasonable

---

[16]   The court notes that the issue confronted in Jones was whether a search had been conducted. *Id.* at 948 ("We decide whether the attachment of a Global-Positioning-System (GPS) tracking device to an individual's vehicle, and subsequent use of that device to monitor the vehicle's movements on public streets constitutes a search or seizure within the meaning of the Fourth Amendment.")  Whether the defendant had standing was not an issue that before the *Jones* court. *Id.* at 949, n.2 ("The Court of Appeals concluded that the vehicle's registration did not affect his ability to make a Fourth Amendment objection, and the Government has not challenged that determination here.  We therefore do not consider the Fourth Amendment significance of Jones's status.")  The framing of Fourth Amendment jurisprudence articulated in *Jones* has wide-ranging applicability, however.  Thus, the court analyzes the standing issue with reference to both *Jones* and *Katz*.

16

expectation of privacy in the interior of the vehicle in which they are riding." *Mosley*, 454 F.3d at 253. This principle applies with even greater force where a passenger is attempting to challenge a search of a vehicle conducted prior to his entry into the vehicle in question. Although the use of the GPS continued during the short time in which Mr. Cabrera was a passenger in the car, this does not establish standing. "[P]assengers are generally held to lack 'standing' to object to evidence discovered in a search of a vehicle." *Id.* (citing *Rakas v. Ill.*, 439 U.S. 128 (1978)).

### 2.  Standing to Challenge the Traffic Stop and Search of the Dodge Ram

In addition to lacking standing to challenge the warrantless installation and use of the GPS tracker, Mr. Cabrera also lacks standing to challenge the evidence seized from the Dodge Ram after the November 21, 2011 traffic stop. Mr. Cabrera again asserts that he has standing by virtue of having been a passenger in the vehicle at the time it was stopped. (D.I. 35 at 6-10.) The government argues, however, (D.I. 37 at 16-18), and the court agrees, that Mr. Cabrera's status as a mere passenger does not confer standing upon him because the traffic stop pursuant to which the search was conducted was legal.

As discussed above, there are no facts in this case that indicate that Mr. Cabrera had any property interest in the Dodge Ram for the purposes of a *Jones* analysis of standing. Thus, the court proceeds to the *Katz* test. As Mr. Cabrera points out, when the police conduct a traffic stop of a vehicle containing both a driver and a passenger, both parties are seized within the meaning of the Fourth Amendment. *Brendlin v. Cal.*, 551 U.S. 249, 251 (2007). As a result, both parties have standing to challenge the constitutionality of the stop. *Id.* Whether the passenger may challenge the evidence discovered in a search pursuant to that stop, however, turns on the legality of the stop. *Mosley*, 454 F.3d at 253. As noted above, passengers ordinarily have no

reasonable expectation of privacy in the vehicle in which they happen to be traveling. *Mosley*, 454 F.3d at 253. Where the vehicle was illegally stopped, however, passengers do "have 'standing' to object to the stop itself, and may seek to suppress the evidentiary fruits of the illegal seizure under the fruit of the poisonous tree doctrine." *Id.* at 253; *see also United States v. Richardson*, 504 Fed. Appx. 176, 182 (3d Cir. 2012).

In the instant case, the traffic stop on November 21, 2011 was legal because it was based on reasonable suspicion of a traffic violation. Police officers "may perform investigatory stops based on reasonable suspicion that 'an individual has violated the traffic laws.'" *United States v. Delfin-Colina*, 464 F.3d 392, 397 (3d Cir. 2006). Reasonable suspicion "is a 'less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence[.]'" *Id.* at 396. Indeed, "only a 'minimal level of objective justification'" is necessary for an investigatory stop. *Id.*; *see also United States v. Givan*, 320 F.3d 452, 458 (3d. Cir. 2003) ("[T]he Fourth Amendment only requires that police articulate some minimal, objective justification for an investigatory stop.") In order to determine if reasonable suspicion exists, the court must consider whether there are "specific, articulable facts" from which rational inferences that an individual has violated the traffic laws can be made. *Delfin-Colina*, 464 F.3d at 397.

As Corporal Seitz explained during both evidentiary hearings, he stopped the Dodge Ram for violating Section 4313 of the Delaware Motor Vehicle Code with its darkly-tinted windows. (D.I. 33 at 78, 85; D.I. 49 at 5.) The uncontroverted evidence indicates that an officer observing the Dodge Ram might have reasonably concluded that the dark tint on the cars windows violated Section 4313. Section 4313 provides that "[n]o person shall operate any motor vehicle on any public highway, road or street with the front windshield, the side windows to the immediate right

18

and left of the driver and/or side wings forward of and to the left and right of the driver that do not meet the requirements of Federal Motor Vehicle Safety Standard 205 in effect at the time of its manufacture." (Gov't Ex. 12 (full text of Section 4313 of the Delaware Motor Vehicle Code).) The dark tint on the Dodge Ram's windows was easily perceived from Corporal Seitz's vantage point and covered not only the windshield, but also the side windows on the left and right sides of the vehicle. (D.I. 49 at 10.) In addition, the dark tint appeared to Corporal Seitz to be an aftermarket modification to the Dodge Ram, rather than a normal feature of the vehicle present at the time of its manufacture. (D.I. 49 at 10.)

Mr. Cabrera's reliance on *United States v. Fong*, 662 F. Supp. 1319 (D. Del. 1987), in arguing that there was no basis for reasonable suspicion in the instant case is misplaced. In that case, the officer testified that "he knew of no Delaware statute that specifically regulates or prohibits tinting of automobile windows." *Id.* at 1321. Thus, his decision that the windows of the defendants' car were too dark was not made with reference to any statute that could establish a violation. Thus, the *Fong* court's conclusion that there was no reasonable suspicion for the officer's decision to stop the defendants' vehicle was that the officer's opinion was "entirely subjective". *Id.* at 1322 (Explaining that because the officer "acknowledged that he was wholly unacquainted with the objective window tinting criteria embodied in 21 Del. C. § 4313", his decision to stop the vehicle was "subject neither to restraint nor even to guidance.") In the instant case, however, Corporal Seitz explained that his decision to stop the Dodge Ram was based on his understanding of Delaware law. (D.I. 33 at 78; D.I. 49 at 12.) Thus, Corporal Seitz was not making a random guess, as the officer in *Fong* admitted that he was.

19

Mr. Cabrera's focus on the pretextual nature of the traffic stop is also unavailing. As Mr. Cabrera points out, (D.I. 35 at 9), Corporal Seitz frankly admitted that the tinted windows were merely a pretext to stop the vehicle in order to aid the ongoing narcotics investigation. (D.I. 33 at 78, 85; D.I. 49 at 5; Gov't Ex. 12.) Mr. Cabrera's inference that the stop was therefore unlawful is incorrect, however. As the Supreme Court has stated, "[s]ubjective intentions play no role in ordinary, probable cause Fourth Amendment analysis" and "we have been unwilling to entertain Fourth Amendment challenges based on the actual motivations of individual officers." *Whren v. United States*, 517 U.S. 806, 813 (1996); *see also Estate of Smith v. Marasco*, 318 F.3d 497, 514 (3d Cir. 2003) ("Improper motive, however, is irrelevant to the question whether the objective facts available to the officers at the time reasonably could have led the officers to conclude that Smith was committing an offense.") Likewise, even if Corporal Seitz's belief that the Dodge Ram's tinted windows violated Section 4313 was actually incorrect, this does not change the legality of the stop. An officer's belief that an individual is violating the traffic laws need not be correct. *Delfin-Colina*, 464 F.3d at 398. It is sufficient that there are facts that make reasonable the officer's belief that the law is being violated. *Id.* ("In other words, an officer need not be factually accurate in her belief that a traffic law had been violated, but, instead, need only produce facts establishing that she reasonably believed that a violation had taken place.")

Having established that the traffic stop pursuant to which the Dodge Ram was searched on November 21, 2011 was legal, the court concludes that Mr. Cabrera lacks standing to challenge the search and to seek suppression of the narcotics discovered in the Dodge Ram during the search.

20

### 3.  Standing to Challenge the Searches of the Christiana Meadows Apartments

As Mr. Cabrera contends, (D.I. 35 at 10), he has standing to challenge the search of apartment 1407 and the evidence seized through that search because he resided there at the time of the search.  As the Third Circuit recognized in *Mosley*, "[i]t is settled law that if the police illegally enter a house and search it, the owner or tenant of the house, or any long-term guests may suppress the evidence found during the search."  454 F.3d at 259.

Regarding apartment 4807, however, Mr. Cabrera argues that his standing to challenge the search and evidence discovered through the search stems from the fact that he possessed the keys to apartment 4807 at the time he was arrested.  (D.I. 35 at 11-13.)  Thus, Mr. Cabrera contends, he had a "direct connection" to the apartment.  (*Id.*)  Unfortunately for Mr. Cabrera, the test of standing is not whether a defendant has a direct connection.  As discussed above, in order to have standing to contest the legality of a search, a defendant must have either a property interest in the premises searched or a reasonable expectation of privacy regarding the property. The court cannot conclude that Mr. Cabrera had a property interest in apartment 4807 when Mr. Cabrera has not even asserted that he was an owner, resident, or even guest of apartment 4807. (D.I. 35 at 11-13.)  Indeed, when Mr. Cabrera was arrested, he stated that he lived in apartment 1407 and denied any connection at all to apartment 4807.  (D.I. 33 at 68.)  Likewise, there are no facts that warrant a conclusion that Mr. Cabrera had a reasonable expectation of privacy in the premises.  It is clear that, in addition to an owner, both a temporary resident of a dwelling and an overnight guest can establish a reasonable expectation of privacy in a dwelling.  *See, e.g.*, *Minn. v. Olson*, 495 U.S. 91, 97 (1990); *Mosley*, 454 F.3d at 259.  Mr. Cabrera's outright denial of any such status is fatal to his arguments.

21

## B. Mr. Rodriguez's Standing

The government does not contest Mr. Rodriguez's standing to challenge the stop of the Dodge Ram, the search conducted pursuant to that stop, and the installation and use of the GPS tracker on the vehicle. This is a sensible approach, since, as the government notes, (D.I. 37 at 13-14), the evidence establishes that Mr. Rodriguez was the sole operator of the Dodge Ram throughout the duration of the investigation. Thus, under the *Jones* majority's approach, Mr. Rodriguez has a colorable argument that he had at least some property rights to the vehicle from which he can derive standing. *See Jones*, 132 S. Ct. at 949, n.2 (Observing in the context of standing that while the defendant was not the owner of the vehicle, he was "the exclusive driver" and "had at least the property rights of a bailee."); *see also United States v. Lopez*, 895 F. Supp. 2d 592, 600 (D. Del. 2012) (Explaining that, in order to have standing, "the defendant must have either owned or possessed the vehicle when the GPS device was installed or must have been using the vehicle when the GPS device was monitoring it.")

Mr. Rodriguez's standing regarding Christiana Meadows apartments 1407 and 4807 is far more tenuous, however. Mr. Rodriguez offers no reason at all why the court should conclude he has standing to challenge the searches of apartments 1407 and 4807 or the evidence discovered through those searches. (D.I. 36.) There is also no evidence that he owned, leased, or ever occupied those apartments. The court cannot but conclude that he lacks standing to challenge the searches of those apartments and cannot seek suppression of the evidence thereby discovered.

## C. Legality of the DEA's Installation and Use of the GPS Tracker[17]

---

[17]     As discussed above, see supra Part III.A., Mr. Cabrera lacks standing to challenge the installation of the GPS tracker on the Dodge Ram. Thus, the court inquires into the legality of the investigators' use of the GPS tracker only for the purposes of resolving Mr. Rodriguez's rights regarding this issue.

In their briefs, the parties debate at length whether a warrant, probable cause, or reasonable suspicion was required to render legal the DEA's installation and use of the GPS tracker on the Dodge Ram. (D.I. 35 at 4-6; D.I. 37 at 20-25; D.I. 46 at 2.) Mr. Rodriguez argues that the Supreme Court's decision in *Jones*, 132 S. Ct. 945 (2012), renders warrantless installation and use of a GPS tracker a violation of the Fourth Amendment and mandates suppression of all evidence discovered through monitoring of the GPS tracker. (D.I. 35 at 6.) The government argues in response that neither probable cause nor a warrant are necessary for use of a GPS tracker and that reasonable suspicion suffices. (D.I. 37 at 20-21.) The court need not reach the issue of whether a warrant or a certain level of suspicion is required to legitimize the use of a GPS tracker, however. Special Agent Hall reasonably relied on his superiors' advice in the absence of binding appellate authority on whether warrantless use of the GPS tracker was permissible. Thus, the court concludes that he acted in good faith and the ends of the exclusionary rule would not be served by suppressing the evidence derived from the use of the tracker.

As the Supreme Court observed in *Davis v. United States*, "[t]he Fourth Amendment protects the right to be free from 'unreasonable searches and seizures,' but it is silent about how this right is to be enforced." 131 S. Ct. 2419, 2424 (2011). The judicially-created exclusionary rule fills this gap by preventing prosecutors from using in court evidence procured through a violation of the Fourth Amendment. *Id.* Suppression of evidence is not a constitutional right, however, nor is application of the exclusionary rule intended to redress the injury caused by an unconstitutional search. *Id.* at 2426. The sole purpose of suppressing evidence pursuant to the exclusionary rule is to deter future Fourth Amendment violations. *Id.* Thus, before imposing

23

this powerful sanction, the court must first and foremost consider whether suppressing evidence would deter police misconduct. Moreover, the court must also account for the considerable social costs, such as the impact on both the truth and public safety, before applying the rule. *Id.* at 2427 (Explaining that "[r]eal deterrent value is a 'necessary condition for exclusion,' but is not 'a sufficient' one. The analysis must also account for the 'substantial social costs' generated by the rule. Exclusion exacts a heavy toll on both the judicial system and society at large. It almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence. And its bottom-line effect, in many cases, is to suppress the truth and set the criminal loose in the community without punishment.") (Citations omitted); *see also Herring v. United States*, 555 U.S. 135, 141 (2009). The exclusionary rule is not intended to be a blunt instrument and "[o]ur cases hold that society must swallow this bitter pill when necessary, but only as a 'last resort.'" *Id.* at 2427 (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)).

Because the focus of the cost-benefit analysis is on the "flagrancy of the police misconduct at issue," only when the police display "'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights" does the deterrent value of exclusion of evidence outweigh the resulting costs. *Davis*, 131 S. Ct. at 2427. As the Supreme Court explained in *Davis*, "when the police act with an objectively 'reasonable good faith belief' that their conduct is lawful, or when their conduct involves only simple, 'isolated' negligence, the 'deterrence rationale loses much of its force' and exclusion cannot 'pay its way.'" *Id.* at 2428 (Holding that "searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule.") Contrary to Mr. Rodriguez's assertions, (D.I. 35 at 16-17), *Davis* does not stand for proposition that only reliance on binding appellate

24

authority explicitly authorizing police conduct constitutes good faith. Rather, *Davis* is merely an application of the longstanding principle that "the deterrence benefits of exclusion 'vary with the culpability of the law enforcement conduct' at issue." *Id.* at 2427 (Tracing the evolution of Supreme Court jurisprudence from an "old, 'reflexive'" approach to the rule to "a more rigorous weighing of its costs and deterrence benefits.") Thus, it was the officers' lack of culpability and the lack of any deterrent value of the exclusionary rule in that case that caused the *Davis* court to hold that the officers were entitled to the protection of the good faith exception.

With those precepts in mind, the court must conclude that the deterrence-oriented ends of the exclusionary rule are not served by suppressing the evidence discovered through use of the GPS tracker in this case. First, the record is clear that prior to installing the GPS tracker, Special Agent Hall completed a form and then sought and received permission from both his direct superior, the group supervisor, and the Assistant Special Agent in Charge. (D.I. 33 at 12, 34; Gov't Ex. 1 (showing both signatures).) Special Agent Hall then also sought permission from an Assistant United States Attorney in the District of New Jersey, AUSA Urbano, and secured authorization through a phone conversation with him. (D.I. 33 at 12, 34; Gov't Ex. 1 (showing notes regarding a conversation with AUSA Urbano).) Only after complying with the DEA's procedures by completing the form and consulting with these three different individuals did Special Agent Hall proceed with the installation of the GPS tracker. (D.I. 33 at 10-13.) The careful steps that Special Agent Hall took prior to having the GPS tracker installed preclude any finding that he was reckless or grossly negligent. His actions also support a conclusion that a reasonable officer in his position would have believed that his actions were lawful. *See, e.g., Messerschmidt v. Millender*, 132 S. Ct. 1235, 1249 (2012) (Explaining that the fact that the

25

officers sought and obtained approval from their superior and a deputy district attorney further established the reasonableness of their belief in the legality of their actions.); *United States v. Lopez*, 951 F. Supp. 2d 657, 668 (D. Del. 2013) (Explaining that the detective's consultation with his superiors prior to installing a GPS device supported the conclusion that he was acting in good faith.)

Second, it is undisputed among the parties that as of September 15, 2011, when Special Agent Hall had the GPS tracker installed, there was no Third Circuit precedent at all squarely addressing whether installation of a GPS tracker required a warrant or some minimum level of suspicion.[18] (D.I. 35 at 17; D.I. 37 at 33-36; D.I. 38 at 2; D.I. 46 at 2.) Thus, there was no binding precedent to be followed. Certainly, it was the case that, as Mr. Rodriguez points out, (D.I. 35 at 4), the United States Court of Appeals for the District of Columbia, ("the D.C. Circuit"), had issued its decision in *United States v. Maynard* prior to installation of the GPS tracker in the instant case. 615 F.3d 544 (D.C. Cir. 2010) (Concluding that prolonged surveillance with a GPS tracker constituted a search that was per se unreasonable under the

---

[18]     In fact, the hints to be found in the Third Circuit's jurisprudence actually suggested that the court was leaning in favor of holding warrantless use of tracking devices constitutional as long as such use did not invade the interior of the home. The Third Circuit's statements in *In re Application of the United States of America for an Order Directing a Provider of Elec. Commc'n. Serv. to Disclose Records to the Gov't* are instructive:

> We cannot reject the hypothesis that CSLI may, under certain circumstances, be used to approximate the past location of a person. If it can be used to allow the inference of present, or even future, location, in this respect CSLI may resemble a tracking device which provides information as to the actual whereabouts of the subject. *The Knotts/Karo opinions make clear that the privacy interests at issue are confined to the interior of the home.* There is no evidence in this record that historical CSLI, even when focused on cell phones that are equipped with GPS, extends to that realm. We therefore cannot accept the MJ's conclusion that CSLI by definition should be considered information from a tracking device that, for that reason, requires probable cause for its production.

620 F.3d 304, 312-13 (3d Cir. 2010) (emphasis added).

Fourth Amendment without a warrant.) It was also the case, however, that all of the other Courts of Appeal that had considered the issue had ruled that surveillance with a GPS tracker was either not a search or did not require a warrant. *United States v. Cuervas-Perez*, 640 F.3d 272, 275-76 (7th Cir. 2011) (Concluding that use of a GPS tracker on the defendant's vehicle did not constitute a search.); *United States v. Marquez*, 605 F.3d 604, 609-106 (8th Cir. 2010) (Concluding that use of a GPS tracker of a vehicle on a public road did not constitute a search and did not require a warrant because "[a] person traveling via automobile on public streets has no reasonable expectation of privacy in his movements from one locale to another."); *United States v. Pineda-Moreno*, 591 F.3d 1212 (9th Cir. 2010) (Concluding that installation of a GPS tracker on the defendant's truck in the defendant's driveway did not constitute a search because the defendant did not have a reasonable expectation of privacy regarding the underside of the vehicle and the driveway.); *United States v. Garcia*, 474 F.3d 994, 996-98 (7th Cir. 2007) (Concluding that use of a GPS tracker did not constitute a search because "[t]he substitute here is for an activity, namely following a car on a public street, that is unequivocally *not* a search within the meaning of the amendment."); *United States v. McIver*, 186 F.3d 1119, 1126 (9th Cir. 2007) (Concluding that use of a GPS tracker was not a search because "there is no reasonable expectation of privacy in the exterior of a car[.]") (Citations omitted).

Considering the lack of consensus among the Courts of Appeal outside the Third Circuit, the court cannot declare unreasonable Special Agent Hall's reliance on guidance from his superiors and the AUSA.[19] In addition, there is no deterrence to be achieved here by suppressing

---

[19]     Mr. Rodriguez also argues that the court's decision in *United States v. Lopez*, 951 F. Supp. 2d 657 (D. Del. 2013) stands for the proposition that the existence of a circuit split at the time the GPS tracker was installed in the instant case means that the good faith exception does not apply to the DEA agents' conduct here. (D.I. 46 at 1-4.)

the considerable evidence in question because of the existence of a circuit split. The hierarchy

that exists in law enforcement on both the state and federal level requires that officers follow

procedures and defer to their superiors' advice. Even if the court could unilaterally empower

officers to disregard their superiors where a circuit split exists, it would hardly be desirable to

incentivize officers to wade unguided through conflicting judicial opinions that they are not

trained to assess. The court must decline the invitation to bring about little good and achieve no

deterrence by penalizing officers for seeking out and following their superiors' advice on the

legality of their actions. The court concludes that the good faith exception protects the actions of

law enforcement in installing and monitoring the GPS tracker.

## D.    Legality of the Searches[20]

### 1.  The Stop and Search of the Dodge Ram

As discussed above, *see supra* Part III.A.2, the traffic stop on November 21, 2011 was

legal because it was based on reasonable suspicion of a traffic violation. *See, e.g.*, *Delfin-Colina*,

464 F.3d at 397 (Explaining that law enforcement officers "may perform investigatory stops

based on reasonable suspicion that 'an individual has violated the traffic laws.'") Specifically,

Specifically, Mr. Rodriguez highlights dicta from a few footnotes in *Lopez* in which the court suggested that it was important to its decision that, at that time, the other Courts of Appeal that had considered the issue were unanimous in their conclusion that the warrantless use of GPS trackers did not violate the Fourth Amendment. (D.I. 46 at 3-4.) The fact that the lack of a circuit split was helpful to the court's decision in *Lopez* should not be taken as a statement that the good faith exception applies only where other Courts of Appeal are unanimous, however. In the instant case, Special Agent Hall sought and received guidance from his superiors, including the AUSA, prior to installing the GPS tracker. Thus, the mere existence of divergence among courts outside the Third Circuit does not immediately render his reliance on that advice unreasonable for the purposes of the good faith exception.

[20]    As discussed above, *see supra* Parts III.A. and III.B., neither Mr. Rodriguez nor Mr. Cabrera have standing to challenge the search of Christiana Meadows Apartment 4807. Thus, the court does not explore at length the legality of that search. Nonetheless, the court notes that the search of Apartment 4807 was conducted pursuant to a warrant that was supported by probable cause. Probable cause is evaluated by examining the totality of the circumstances and determining whether there is a "fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Grubbs*, 547 U.S. 90, 95 (2006) (quoting *Ill. v. Gates*, 462 U.S. 213, 238 (1983)). Here, probable cause is amply established by the facts detailed in the warrant. (Gov't Ex. 8 (search warrant and application and affidavit for 4807 Christiana Meadows).)

the dark tint on the Dodge Ram's windows created a reasonable basis for Corporal Seitz to suspect that the Dodge Ram was violating Section 4313 of the Delaware Motor Vehicle Code. Once the Dodge Ram was stopped, the parties do not contest that Mr. Rodriguez consented to the search of the vehicle. (D.I. 33 at 80-81.) Mr. Rodriguez's consent as the operator of the vehicle constitutes a valid basis to conclude that the search was legal. Consequently, the evidence found as a result of the search cannot be suppressed.

### 2. The Search of Christiana Meadows Apartment 1407

Mr. Cabrera's challenge to the search of apartment 1407 at Christiana Meadows cannot succeed. As the record indicates, and he concedes, Mr. Cabrera consented to the search. (D.I. 33 at 27-29, 59-60; D.I. 35 at 3-4, 10.) Indeed, as Mr. Cabrera also concedes, the woman residing at the apartment, who identified herself as Anna Lee Duran-Medina and Mr. Cabrera's girlfriend, also gave consent for law enforcement to search the apartment. (D.I. 33 at 60-61; D.I. 35 at 4.) There are no facts suggesting that Mr. Cabrera and Ms. Duran-Medina's consent was the result of coercion or otherwise not freely given. Mr. Cabrera does not allege otherwise. Consequently, Mr. Cabrera and Ms. Duran-Medina's consent to the search of apartment 1407 renders the search legal. *See United States v. Matlock*, 415 U.S. 164, 171 (1974) ("[W]hen the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected."); *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) ("It is equally well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."); *United States v.*

29

*Givan*, 320 F.3d 452, 459 (3d Cir. 2003) ("It is well settled, however, that a search conducted pursuant to consent is one of the specifically established exceptions to the search warrant requirement.") There is no basis at all for suppression of the evidence found during the search.

## IV.    CONCLUSION

For the foregoing reasons, the court hereby grants Mr. Rodriguez's Motion to Join and Adopt Motion to Suppress Physical Evidence, (D.I. 31), but denies the Defendants' Motion to Suppress, (D.I. 28).

Dated: July 15, 2014

UNITED STATES DISTRICT JUDGE